Good morning, Your Honors, and may it please the Court, Atul Acharya for the Plaintiff Appellant Musa Weldeyohannes, I'd like to reserve three minutes. Thank you. This case is about how a state may treat its disabled prisoners. What obligations it has toward them to keep them safe, or at least to refrain from harming them. My client is wheelchair-bound and has been for years. Instead of providing him safe and dignified transportation as it does for its non-disabled prisoners, the state demanded that he climb the steps of a regular transport bus and then forcibly dragged him aboard when he couldn't comply. This violated federal law in three ways. First, the state denied my client a reasonable accommodation as required by the ADA and the Rehabilitation Act, and it did so with deliberate indifference. Second, the officers involved were also deliberately indifferent to a serious risk of harming my client in violation of the Eighth Amendment. And third, the force they used was so unnecessary and wanton that it also violated the Eighth Amendment's prescription against the unnecessary and excessive use of force. Nearly everything in this case turns on knowledge, the state's knowledge for the statutory ADA and RA claims, and the officer's knowledge for the Eighth Amendment claims. The facts there are heavily disputed, which means that at summary judgment, they should have been resolved in favor of my client, as the magistrate judge correctly did. Is it disputed that the officials at the scene thought that he had a classification of T1, that they had checked and it was T1? Is that disputed? That is disputed, Your Honor. And I want to talk about that. It's not disputed whether that was the classification, but disputed whether that's what they thought. Yes, Your Honor. That is disputed. And on what basis is that disputed? A couple of things. First, whether they checked. I'll start there. Well, they say they checked. They there is no there's no declaration where they say they checked, Your Honor. There's no evidence in the record that they checked. No officer, only Gantier, filed a declaration and he his declaration doesn't say that he checked. There's the state's answer where the state says that the officers checked. But the state's answer is an evidence. No party has attested to its truth under penalty of perjury. So it's just attorney argument. The only evidence in the record about the officers checking the system actually comes from my client's testimony, where he says, and I think it's on page 174 of the excerpts. He says, Varis, Varis is the one that goes to the computer and he comes back and he says, I don't see any HSRs for you, any prescriptions. Now, that's not a transport code. He doesn't say I saw a T1 code for you. He doesn't say I couldn't find a transport code for you. He says, I saw no HSRs for you. And HSRs, there's no dispute that my client had lots of HSRs. He had HSRs for a wheelchair, lower tier, lower bunk. And all of these are in the record. And the ombuds letter doesn't say that those were mistakenly entered. So based on the fact that he went to the system, came back and said he couldn't see something that was there, the magistrate judge held that a jury could reasonably find that he didn't check at all, that he just purported to check. And that's on page 26 to 27 of the excerpts. OK, so in other words, the district judge is wrong when the district judge says they relied on the fact that they had seen a classification of T1. Absolutely, Your Honor. I think the district judge relied on the answer, but the answer isn't evidence. My client's complaint is evidence because he signed under penalty of perjury that the contents of it were true. I have a question for you. Even if the people who were to transport the prisoner had seen a code that was incorrectly coded, that they thought he was not coded for a wheelchair, would it have been obvious to them that a person in a wheelchair needed safe transportation? I certainly think so, Your Honor. I think the fact that he showed up in a wheelchair and that he told them that he couldn't get on the bus, that he needed an accessible mode of transportation is enough for them to have knowledge. OK, would that be enough for deliberate indifference? I think so, Your Honor. And I should clarify, all of the facts about the morning after transfer really go to the Eighth Amendment deliberate indifference claim. And there, in cases like Wilk and Clem, this court has held that once an officer is exposed to knowledge, such as, for example, by the prisoner telling the officer, hey, I face this risk, then the officer is deemed to have that knowledge for summary judgment because a jury can infer that the officer had that knowledge. An officer can tell the jury, in fact, I didn't believe the guy. But then it's for a jury to decide whether to find that credible or not. At summary judgment, the exposure to the information gives the officer knowledge, or at least so a reasonable jury can find. So do all the claims depend on deliberate indifference? Not the excessive force claim, Your Honor. The excessive force claim depends on a subjective intent to cause harm. And I'm happy to talk about that if the court would like. Well, I would like you to elaborate on that because I didn't know what all the cases showed on it. But it seemed like like putting someone who had been in a wheelchair into a van on the floor could cause injury to them. Certainly, Your Honor. In the excessive force context under the Eighth Amendment, the test is whether the officers had a subjective intent to harm the person. And this court analyzes that using five factors, the extent of the injuries, the need for force, the proportionality, the need versus the amount, the threat the officers reasonably perceived, and any efforts they made to temper their use of force. The extent of the injuries here is severe. My client suffered a rebroken shoulder, exacerbated chronic back and leg injuries, reinforced PTSD, extreme pain. He now suffers nightmares every night where he realizes the torture he suffered at the hands of his police in the home country because of his treatment by the state of Washington. The need, there was no need to use force. My client was peacefully explaining that he couldn't get on the bus. Because there was no need for force, the use of any force was disproportionate. The officers didn't reasonably perceive any threat from my client because he was a wheelchair-bound, seriously disabled man who was peacefully explaining that he couldn't get on the bus. And this much is undisputed. The state doesn't say the officers perceived a threat from him. And the officers made no attempt to temper their use of force. In Bell against Williams, a similar degree of force with a similar need, a need to move a disabled wheelchair-bound prisoner from one cell to another. The prisoner there actually used greater force. He had barricaded, sorry, greater resistance. He had barricaded his cell at one point. And this court held that the use of force there was excessive. If it was excessive in Bell, it was certainly excessive here. It was a greater degree of force here as well. I want to go back to the ADA just for a second because we've been talking about the morning of the transfer. And on the ADA and RA claims, what happened on the morning of the transfer is essentially irrelevant. Because even if the system showed a T1 code, and it didn't, but even if it did, the state assigned my client a T5 code. That means a prison medical provider assessed my client and determined that he couldn't climb the steps of a regular bus and he would need special transportation. This is undisputed. The state assigned my client a wheelchair, a lower tier, and a lower bunk, which means a prison medical provider assessed him and determined that he couldn't climb up the steps to an upper bunk bed, which is pretty similar to climbing up the steps of a regular bus. This is also undisputed. Also undisputed is my client sent requests two weeks in advance to the captain of the facility, the correctional program manager, and the medical department. Key state employees saying, if I'm going to do this transfer, I'm going to need accessible transportation. All of this is enough by itself to give the state knowledge. And under the ADA and RA, the question is the entity's knowledge, not the individual officers on the morning of the transfer. Did the state have the requisite knowledge? And then was the state deliberately indifferent? What's the best case for you on that? Your Honor. What's that? Updike, Updike against Multnomah County, and then Duval against Kitsap. Both those cases say, I'll just quote from them a little bit, whether the plaintiff has alerted the public entity, whether the public entity was on notice, that's Duval, whether the public entity ascertained what accommodations might be needed, and whether the public entity complied with its duty to look into and provide a reasonable accommodation. So it all comes down to what the state knew and what the state did, not what the individual officers knew and did. So here, the state knew because it's the one that gave him the T5 code, and he sent messages in advance, two weeks in advance, to key state actors asking for an accommodation. At that point, what was the state's duty? It had an obligation to investigate his request for accommodation. In Updike, this court explained that a denial of a request for accommodation without an investigation is by itself enough to deny summary judgment on deliberate indifference. That's at page 954 of Updike. And that, the court could stop its analysis there on the ADA and RA claims. There's no evidence that the state performed any investigation into my client's advance requests. I think my friend on the other side argues that perhaps the state didn't get those messages, but points to no evidence to that effect. And in fact, my client's testimony is that Sergeant Gonthier was holding printouts of those messages. So at summary judgment, the inference is that the state sure did receive those messages and then ignored them. That's deliberate indifference. And I think I'm right with respect to an ADA claim that the 11th Amendment immunity is overridden by the statute. Yes, Your Honor. That, I think, is I think there's a Supreme Court case. I think it's Georgia against, I forget the. Can let me ask you a factual question. Does your client speak English? He speaks a little English, Your Honor. Enough to explain himself and say, I showed up in a wheelchair. I need special transportation. Yes, Your Honor. I spoke to him on the phone. It's it's it's it's it's certainly not a dediction of an Oxford Don. And when he was presented for transport, presumably he was in his wheelchair. Yes, Your Honor. Do you have any understanding of what happened to the wheelchair after he was placed on the bus? I do not. Okay. My friend on the other side argues that he just walked off the bus. My client has expressly said in his testimony that that's false. On page 53 of the excerpts, the magistrate judge agreed with his. So in his complaint, he said some officers took me out of the bus in similar fashion. Magistrate judge agreed that that meant that they carried and dropped and dragged him out of the bus. So they was they put him on. That was his testimony. And then on 53 of the record, he expressly says that that claim that he just stood up and walked off the bus is false. He can't do that. And earlier, you stated, counsel, that there was no evidence that there was only in the answer that the district judge read that the T code was incorrectly placed in his medical file. So I just want to confirm that there was no other evidence presented that he had a T1, not a T5. There's well, so there's there's two things. There's the ombuds letter, but it doesn't say he had a T1. It says he had a T5 and then it says it was incorrectly entered into the system, which raises a bunch of questions like what was the basis for that finding? And most importantly, if the if the ombuds could see it because the ombuds saw that he had a T code somewhere, could the officers have seen it on the morning as well if they had checked? And for the reasons I explained, they didn't, or at least that's the inference of summary judgment. The magistrate judge correctly found that that if the ombuds could see a T5, the jury can infer that the officers would have seen it too. And then the only other piece of evidence there is this declaration from one officer long where he says outright, well, they had a T1 T code. Long wasn't there. He wasn't there in the morning of the transfer. He says that he relied on the use of force reports, but the use of force reports don't support that at all. You can comb them closely. I certainly have many times and they don't even say that the officers checked his T code, much less that they saw a T1 code. So, Long's testimony is is without basis and and it's at best it's speculation. Is this 15 minutes or 12 right now? OK, I see then that my time is running out, so I'll save the rest for a bottle. Thank you. Thank you. OK, we'll have Miss Grissman for the state of Washington. Thank you. Good morning, Your Honors. May it please the court. Assistant Attorney General Sarah Brisbane appearing for the defendants. Mr. Weldy-Ohanas' claims were properly dismissed at summary judgment because he failed to show a material dispute of fact. The district court properly granted summary judgment for the defendants, and this court should affirm for three reasons. First, while in the district court, Mr. Weldy-Ohanas conceded that special transportation was not provided because of a coding error and therefore cannot show that disability was a motivating factor as required under the ADA and RA. I'm going to stop you right there. You say he conceded in the district court? Yes, Your Honor. What form did that concession take? So he said at, you'll see this at ER 81, he wrote that the transport code had been wrongly entered in DOC's Omni, which caused improper transportation. There's additional sites as well that I can provide. He also says at one point that the T5 code disappeared from the computer and that's at ER 41. I'm sorry. I didn't hear what you said about this. Say that sentence again. I didn't hear very well. Oh, I apologize. At ER 41, he said the T5 code entry disappeared from the computer the morning of the transfer. And does he know that or is he just saying that? What basis? I mean, he's pro se and I'm trying to figure out how much importance we should attach to that. And if it's a harmful statement from him, how much we should hold it against him. Like, how does he know that? Maybe that's what he's told. I'm trying to figure out whether that's really disabling for him once we get here, now that he's got a lawyer, he's no longer pro se and so on. Absolutely. So he says that at those times. Additionally, he relies on the ombuds letter as well as the DOC memo, which says that the code was entered incorrectly. What if those things he's relying on, in fact, are those are unreliable? There's no evidence in the record to suggest they're not reliable. And we see this in the district court's order granting summary judgment where the district judge clearly relied on. I get that part. The district court in its order understood that this was an undisputed fact. Now, I interrupted you at number one, you've got number two and three. I'm sorry. So second, with respect to the Eighth Amendment deliberate indifference claim, Mr. Weldy-Johannes failed to show that the defendants were aware of a risk and failed to respond reasonably. Finally, with respect to the excessive force claim, Mr. Weldy-Johannes failed to provide sufficient evidence for his excessive force claim. I was going to turn first to the ADA RA. And there, as we had been discussing, under the ADA and RA, Mr. Weldy-Johannes must put forward specific facts showing that the defendants denied him access to wheelchair accessible transportation or otherwise discriminated against him by reason of his disability. So let me ask you this. When he presented for transport, was he in a wheelchair? Yes, Your Honor. Is he able to get a wheelchair if he doesn't need one? No, he's not able to get a wheelchair if he doesn't need one. That said, what's in the record is that individuals often arrive at a receiving unit, which is where the buses are for transfer, in wheelchairs, even if they're otherwise able to ambulate onto a bus, because the receiving units are quite a far distance from a housing unit. So the wheelchairs there are used similarly where we would see like an airport where an individual needs additional accommodations to get from maybe the security checkpoint to their boarding gate. So I'm a little confused by the facts in this case. So hopefully you can kind of clarify for me. So he shows up, he's in a wheelchair. Is it your contention that he says something to the officers or does not say something, saying, I don't know what you're doing here, I can't get on this bus, I need a special bus because I need to stay on my wheelchair? Or did they not even have that conversation and they just said, hey, sir, we need to get you on this bus? They had that conversation. OK, and then what happened? So he mentions to them, I need to stay on my wheelchair, I can't walk up these steps. And then what happens? So that conversation was had with Sergeant Lee. Once Sergeant Lee is informed of that, he contacts health services and asks, is it OK that he be transferred? At that point, health services tell Sergeant Lee that medical has no concerns with him being transferred by a standard transport bus. OK, counsel, I have a question for you. If he's is it your position that if he's even if he's in a wheelchair and and even if it's if it's assume it was misquoted, that that the transport officers can pick him up like a sack of potatoes and put him on the floor, on the floor of the transport. On the floor of the transport van. No, your honor. And here we see that the officers checked with medical and were told that there was no reason that he needed to be transported by by a special transport bus. There was also the issue of the T1 code. There's also in the HSRs that he received, in addition to having access to a wheelchair, he also had access to a walker. Which would further support the officer's conclusion that he was able to walk onto the bus. Was there a walker there? There was not, your honor. Was one provided for him to use to walk onto the bus? I don't believe that's in the record. OK, did the officers put him on the floor, just put him on the floor on the floor of the bus? Whether they did it, throwing him like a sack of potatoes or gingerly setting him down on the floor. But did they put him on the floor of the bus? What's in the record, I believe, is that they secured him in a holding cell on the bus. In a holding cell on the bus. OK, so does the person have to stand up to be in that holding cell? No, it's a it's a seat. It's what? It's a seat. And a seat. OK. Isn't there something in the record where he states that they put him on the floor? I mean, they may have ended up in the holding cell, but that there's something in the record where he says that they put him on the floor. I believe he says in the process of getting him on the bus that they. Put him on the floor as they were navigating the stairs. What injuries did he sustain as a result of them placing him on the bus? He claims he was injured. And it's also undisputed that as soon as he was on the bus, Nurse Olson Ward came on the bus, asked if he was injured and he didn't report any injuries. So did he not suffer the fracture? That would be disputed. OK. That's what that's what did you say? That's disputed that he suffered injuries from the from the transfer. I guess what I'm asking, though, is I get that it's disputed if it was as a result of the transfer. But when he got to the new facility in Walla Walla, did they check him out? Did he, in fact, present it with a fracture? So as soon as incarcerated individuals arrive at a new facility, they're taken directly to health services for in processing. There's nothing in the record to suggest that he told anyone upon arrival at health services that he was injured. So when they or did they check them then or that would be part of the standard in processing and they didn't find any injuries on his shoulder? I don't believe that's in the record. Your friend on the other side in his opening statement to us basically said, yeah, he I believe he used the term fracture. I'm not sure, but his shoulder was hurt. So I'm just wondering, is that factually true? Did you find that when he was placed in the Walla Walla facility? I don't believe the answer to that is in the record. I can't answer that. I don't believe there was a fracture when he arrived at Walla Walla. Counsel, there are so many questions that that are raised that would you agree that it would be more fair to all parties to let them have a trial because of issues of fact and let the trial judge make specific findings? To resolve the case. Based on Mr. Weldy Ohanis testimony that he was severely injured in in this transfer, that appears uncorroborated by any other testimony. And based on the rest of the record, taking his statements in context, it appears, oh, sorry, it appears implausible. Here, as soon as he was on the transport bus, Nurse Olson Ward boarded and asked if he was injured and he said no from the transfer. He was taken directly to health services and we don't see that he reported being injured, even though was taken directly to a health clinic upon arrival at WSP. Based on the record, there's his statements just seem implausible and without any other corroborating evidence, the rest of the record as a whole shows that the defendants here did not violate his Eighth Amendment rights and complied with ADA. Let me ask you about the video. There's something in the record about he requested the video showing what happened. Can you tell me what what happened there? So there's in the in the docket in the excerpts of record, we can see that there's no motion to compel. There's no motion for an extension continuance. He didn't have counsel at this time, correct? Correct. OK, his complaint does. Oh, gosh, I'm sorry. Just go for it. His complaint does reference the video and it's undisputed that there is a video is taken as part of the policy here. And he never requested the video and discovery. Correct. But there is a video, correct? So I will briefly switch to the Eighth Amendment deliberate indifference claim. Deliberate indifference under the Eighth Amendment is a high legal standard and requires a showing that defendants knew and deliberately disregarded an excessive risk to health and safety. And to show deliberate indifference, the plaintiff must show that the defendants were aware of the facts and subjectively drew that inference. Here, Mr. Weldy-Johannes has not shown a general dispute of fact because the defendants were not aware of an excessive risk to his health and safety. Well, they were told maybe they didn't believe it. So what do we mean by aware? So here we have that once they were told, they immediately talked to health services to verify and ensure that he could safely be transported and were told that there was no concerns. Well, tell me about Olson Ward's medical assessment where she said he could be transported. I don't believe there's anything in the record as to what she looked at. However, what does a medical risk evaluation generally look at? It would review his medical records and ensure that he could could safely be transported. Don't they look at things like whether or not you can use pepper spray, tear gas or an electronic control device? Do they specifically look at his records or just generally is there something related to this particular individual where we couldn't use, I don't know, a taser because he has a heart condition? I think your honor is referencing the use of force report. That would be separate from the comment that Nurse Olson Ward made to Sergeant Lee. That was before the use of force report, before the CERT team was called and that process was started. The use of force report that your honor is referencing that does reference specifically if the individual has medical conditions that would prohibit certain uses of force. And were there was there anything found there that said you some particular uses of force were not allowed or should not be used? If I recall correctly, I believe that there was a reference to Mr. Well, your honor's having a condition that prohibited the use of a taser, I believe, but that wasn't used here. So as far as deliberate indifference. Oh, I see. I'm very close to the end of my time. With that, thank you, your honors, and defendants would ask that this court affirm. Thank you. The appellate can make rebuttal now. Just a couple of points on rebuttal, your answer, your honor. First, as far as the supposed concession that my client made in the district court, he didn't make any such concession. And the best evidence of that is that that's not how the magistrate judge read his his papers. And the district judge didn't rely on any purported concession either. My friend on the other side talked about supposed concession on page 81 of the excerpts on page 80. Just before that, you'll see he's saying the defendants issued an interdepartmental memo saying he's characterizing defendant's position. He's characterizing what the defendants say, what the ombuds letter says. He's not adopting that for himself. And he can't, he has no knowledge of what T code the system may have shown on the morning of. So there's no concession that he had a T code, and certainly nothing conceding that the officers even checked. As I mentioned in his complaint, he testified that Veras went to the computer, came back, and said no HSRs, didn't say anything about a T code. So whatever the system may have shown, no one checked, and he certainly didn't concede that he had a T1 code and that the officers relied on that. As far as insufficient evidence, I do want to talk about that. My friend on the other side says that there's no corroborating evidence of the injuries he suffered and so on. First, there is on page 75 of the record, there's a doctor's note where he's getting a follow up to an x-ray of his right shoulder. So there is evidence corroborating that. But on top of that, there is this video that appears all over the record. It's the dog that didn't bark until on page 154, 101, 113, 118, 125. All these pages where a defendant's own evidence mentions this video that would prove or disprove almost all of their assertions that he was refusing a transfer. That they checked his records, that they used de minimis force, that they didn't slam, drop, and drag him up the steps of the bus. And my client did request this video. In his complaint, he said, there's this video, it'll prove my claims, I'd like to be preserved. And at summary judgment, he objected to summary judgment proceeding without, he said photos, but as I said, his English isn't the best. He was talking about what was recorded on the camera that he saw the defendants holding. In Jones against Blanus, this court said that summary judgment is disfavored where relevant evidence remains to be discovered, particularly in cases involving confined pro se prisoners. In Calloway, based on Jones, this court held that considering the allowances that must be made for pro se prisoners, it would construe as a rule 5060 request for further discovery before judgment. A very similar statement that the prisoner there made in his papers. My client made the exact, or a very similar request here, and that'd be on page 87 of the record, so it should do the same. This court should hold that summary judgment is never appropriate when a pro se prisoner asks for video that undisputedly exists. I see that my time has expired, so I'll just close with this. An update, this court said that a public entity may not disregard the plight and distress of a disabled individual. That's exactly what the state did here. It's what the officers did too, and they used excessive force doing it, so this court should reverse. Thank you. Okay, thank you, counsel. I want to thank counsel on both sides of the case for their helpful and cogent arguments. This case will now be submitted, and the parties will hear from us in due course.
judges: FLETCHER, GOULD, ALBA